UNITED STATES ex rel. CASTRO v. WILLIAMS, U. S. Com'r of Immigration, et al.

(District Court, S. D. New York. February 15, 1913.)

1. ALIENS (§ 44*)—RIGHT TO ENTER.

Aliens are entitled to enter the United States except so far as the right is restricted by statutes defining the excluded classes; the burden being on the immigration authorities to show that any alien denied the right to enter falls within one of the exceptions to the general privilege.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 102–104; Dec. Dig. § 44.*]

2. ALIENS (§ 40*)—APPLICATION TO ENTER—RIGHTS.

Although an alien who has not yet entered the United States may not enjoy the constitutional guaranties of citizens, he nevertheless has rights under the immigration laws which the immigration authorities are bound to respect.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 100; Dec. Dig. § 40.*]

3. ALIENS (§ 46*)—RIGHT TO ENTER—EXCLUSION—PERSONS HAVING COMMITTED A FELONY OR OTHER CRIME OR MISDEMEANOR INVOLVING MORAL TURPITUDE—EVIDENCE.

Under Immigration Act Feb. 20, 1907, c. 1134, § 2, 34 Stat. 898 (U. S. Comp. St. Supp. 1911, p. 500), providing for the exclusion of persons who have been convicted of or admit having committed a felony, or other crime, or misdemeanor involving moral turpitude, where there is no proof that an alien has ever been convicted of an alleged crime in the country where it was committed, the only proof that is competent for the immigration authorities to receive, on which to base an order of exclusion, is the alien's own admission, nor can this be presumed by his

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

refusal to answer questions put to him by the immigration authorities with reference to such alleged crime.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

4. ALIENS (§ 46*)—EXCLUSION—IMMIGRATION ACT—CONSTRUCTION.

Immigration Act Feb. 20, 1907, c. 1134, § 2, 34 Stat. 898 (U. S. Comp. St. Supp. 1911, p. 500), providing that nothing contained in the act shall exclude an alien if otherwise admissible because of his having committed an offense purely political, had no application to an alien who has not been actually convicted of an offense, for the alleged commission of which he is sought to be excluded.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

At Law. Habeas Corpus by the United States, on the relation of Cipriano Castro, late president of the republic of Venezuela, to obtain his discharge from custody of William Williams, United States commissioner of immigration at the Port of New York, pursuant to deportation proceedings. Writ granted, and relator discharged.

Geo. Gordon Battle, of New York City, for relator.

Henry A. Wise, of New York City, for respondent.

WARD, Circuit Judge. [1, 2] Aliens have the right to enter the United States except so far as the right is restricted by our statutes. Section 2, Act Cong. Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1911, p. 500), defines in separate classes the aliens that are to be excluded. The burden is upon the immigration authorities to show that any alien denied the right to enter does fall within one of these exceptions to the general privilege. Although an alien who has not yet entered may not enjoy the constitutional guaranties of citizens, he has rights under this law which must be respected.

The board of special inquiry has held, and its decision has been affirmed upon appeal to the Secretary of Commerce and Labor, that Gen. Castro shall be excluded because he has admitted the commission of a crime involving moral turpitude, viz., the murder of Gen. Paredes, and therefore falls within the excluded class of "persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude."

[3] It is to be noted that Congress has required in respect to this particular class of aliens proof of a specified kind and no other, viz., either a conviction in the country where the crime was committed or an admission by the alien. There is no pretense of any conviction, and I think ordinary proof is not sufficient. Testimony of unimpeached eyewitnesses that they had seen Gen. Castro kill Gen. Paredes with his own hand in cold blood would not only be insufficient, but would be wholly incompetent. Therefore telegrams passing between the state department and its representative at Caracas upon which the board relied are not evidence whatever to connect Gen. Castro with the death of Gen. Paredes. When examined before the special board, he had the right to insist that the proof on this point be restricted to that required by the act, viz., his own admission. This provision must have

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

been intended as a limitation upon the power of the immigration authorities. It deprives them of the right to try the question of guilt at all. So it is a privilege to aliens because it insures them against any such trial. This privilege is entirely taken away if an admission may be rested upon presumptions arising from the alien's refusing to answer questions on the subject when under examination. I think the act contemplates an explicit and voluntary admission. The same kind of reasoning as is here relied upon by the government was passed upon by the Supreme Court in respect to the degree of proof in Chaffee v. United States, 18 Wall. 516, 21 L. Ed. 908. There the trial judge instructed the jury that, although the government was obliged to prove the offense charged beyond a reasonable doubt, still, if it had made out merely a prima facie case, the jury might, if the defendants did not meet it by producing their own books or taking the stand, arrive at the conclusion that there was no reasonable doubt by relying upon the presumption that they would have taken the stand or produced their books if their testimony or their books would have been favorable to them. The Supreme Court held that this doctrine would turn the defendants' constitutional right not to testify, intended for their protection, into an engine for their sure destruction:

"The purport of all this was to tell the jury that, although the defendants must be proved guilty beyond a reasonable doubt, yet if the government had made out a prima facie case against them, not one free from all doubt, but one which disclosed circumstances requiring explanation, and the defendants did not explain, the perplexing question of their guilt need not disturb the minds of the jurors. Their silence supplied in the presumptions of the law that full proof which should dispel all reasonable doubt. In other words, the court instructed the jury, in substance, that the government need only prove that the defendants were presumptively guilty, and the duty thereupon devolved upon them to establish their innocence, and, if they did not, they were guilty beyond a reasonable doubt. We do not think it at all necessary to go into any argument to show the error of this instruction. The error is palpable on its statement. All the authorities condemn it. The case of Clifton v. United States, in 4 How. [242, 11 L. Ed. 957], cited by the court below, was divided upon a statute which cast the burden of proof upon the claimant in seizure cases after probable cause was shown for the prosecution, and therefore has no application. The instruction sets at naught established principles, and justifies the criticism of counsel that it substantially withdrew from the defendants their constitutional right of trial by jury, and converted what at law was intended for their protection—the right to refuse to testify—into the machinery for their sure destruction."

How very different was the board's understanding of the law appears from the two findings which it made as follows:

"In the course of this examination this alien has committed frequent perjury. He has pretended to be ignorant of the matters concerning which a man of his intelligence and holding the position which he did undoubtedly possesses knowledge. Speaking of Louis Varela, who sent him frequent telegrams in regard to the capture and death of Gen. Antonio Paredes, he says, 'I do not know who he is.' We consider him an unreliable witness. His testimony to the effect that no foreigners suffered losses of property through his actions during the years when he was president we decline to believe. His refusal to reply to many questions put to him bearing upon his right to land convinces us that there exist damaging facts which he desires to conceal. Upon information received from official sources he was charged with responsibility for the unlawful killing of Paredes, but declined repeatedly to offer

any explanation or give the government any information in regard to the latter's death. He refused either to affirm or deny his guilt, even after he had been warned that unfavorable inferences would be drawn from such refusal, and that he must take the consequences. Such refusal, together with his manner and demeanor when asked concerning these matters, constitute in our opinion an admission of the truth of the charge. He is therefore excluded on the ground that he has admitted the commission of a crime and felony involving moral turpitude. * * * The additional evidence strengthens materially and confirms the grounds upon which the board based its first excluding decision. The State Department now submits this telegram sent by Castro to Varela on February 13, 1907, upon hearing of the capture of Paredes: 'You should give immediate orders to shoot Paredes and his officers. Advise me of receipt and fulfillment.' The State Department also submits sworn testimony taken in court showing that these orders were complied with. Such testimony shows that Paredes was not killed in any attempt to escape, but that, on the contrary, he was by order of Castro killed in a cold-blooded manner, without a pretense of a trial, and in violation of the rules of civilized warfare. Notwithstanding Castro was summoned before this board to hear and explain, if he could, the additional evidence, he refused in an insolent and defiant manner to listen to it or to answer. He stands before this board applying for admission to the United States, and yet declines to give information bearing directly on his admissibility. Nor is his attitude consistent with that which an innocent person would assume when confronted with proof of a crime. His silence and behavior are under the circumstances an admission of guilt. He is again excluded as admitting the commission of a crime involving moral turpitude, namely, the murder of Gen. Paredes."

Everything said about the alien's frequent perjury and pretended ignorance of things he must have known and about his refusal to answer questions relating to the death of Gen. Paredes in the first finding and about the telegrams and diplomatic correspondence in the second is irrelevant. He was not bound to submit to examination upon the subject. It is not enough as the government contends that there should be some evidence to support the findings of the board. In this particular class of aliens there must be some evidence of the specific kind prescribed by the act.

The Secretary, as might naturally be expected, confined himself to the material question whether the proof established an admission within the meaning of the act. He relied upon United States v. Sing Tuck, 194 U. S. 161, 24 Sup. Ct. 621, 48 L. Ed. 917, which justified the board in drawing the conclusion that Chinamen were not born in the United States from the fact that they refused to answer questions upon the subject or stood absolutely mute. But the Chinese Immigration Acts put the burden of proof expressly upon the Chinamen, and contain no restriction whatsoever as to the kind of proof upon which the immigration authorities are to act. He also cited United States v. Williams (D. C.) 175 Fed. 274, in which the court justified a deportation on the ground that there was some evidence that the alien was likely to become a public charge. This was a matter of proof generally and not of restricted proof as in the case here under consideration.

[4] Finally, he considered whether the offense charged fell within the proviso of section 2, "that nothing in this act shall exclude, if otherwise admissible, persons convicted of an offense purely political." Gen. Paredes was killed while engaged in an insurrection against the government of Venezuela while Gen. Castro was president. If Gen. Castro ordered him to be killed, the offense was plainly political, but

the proviso does not apply because Gen. Castro has never been convicted of the offense, and therefore inquiry whether such an act involves moral turpitude is immaterial. It is but fair to state that Gen. Castro was amazed, excited, and alarmed by much connected with the examinations he was submitted to from the moment he arrived, which not unnaturally excited his indignation. I think the immigration authorities have erred as a matter of law in their construction of the statute, and so have exceeded their jurisdiction. United States ex rel. Jcheil Rosen v. William Williams, etc., 200 Fed. 538 (opinion of the United States Circuit Court of Appeals for this Circuit).

The prayer of the petition is granted, and the alien discharged.