UNITED STATES ex rel. JELIC v. DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION, ELLIS ISLAND, NEW YORK HARBOR.

No. 405.

Circuit Court of Appeals, Second Circuit.
July 17, 1939.

CHASE, Circuit Judge, dissenting.

Walter H. Pollak, of New York City (Carol King, of New York City, on the brief), for relator-appellant.

Noel Hemmendinger, Asst. U. S. Atty., of New York City (John T. Cahill, U. S. Atty., of New York City, on the brief), for respondent-appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The relator, a native-born Croat, now a practicing physician of Berlin, Germany, possessing a duly visaed Hungarian passport, sought admission to the United States as a visitor, asserting, as his objective, rest and cure of his health in this country. So far, he has found the pathway to his objective rocky indeed.

Arriving in this country on February 2, he was delivered at Ellis Island on February 3, 1939. He was then examined before a Board of Special Inquiry, and testified through an interpreter in German. The hearing was continued until February 6, 1939, when he again testified, this time through an interpreter in Croatian. These examinations covered the purpose of his

trip to this country, his Hungarian passport based upon his application for Hungarian citizenship, and his political activities in his native country, Yugoslavia. At their conclusion he was denied admission by the Board, on the ground that he had not established a non-immigrant status as a visitor and was therefore to be excluded as a quota immigrant not in possession of the required immigration visa. He appealed. On February 17, 1939, the Board of Review recommended that the case be reopened to give "consideration" to a letter from the Department of State of February 11, 1939, and its enclosures, "in so far as they touch upon the right of the alien to enter the United States and with particular reference to the matter of whether the alien admits or affirms an admission said to have been made before the American Consul in Berlin that he—(1) Impersonated another in applying for an immigration visa, or (2) Forged the name of another to an application for an immigration visa." On the next day the Commissioner of Immigration directed the authorities at Ellis Island to reopen the case before a Board of Special Inquiry for the recommended purpose (stated in the same language as was used by the Board of Review), and requested that the rehearing be expedited as much as possible. The rehearing was had on February 20, and again resulted in an order of exclusion.

Though never introduced in evidence against the alien, the letter of February 11, 1939, from the Department of State by the Under Secretary to the Secretary of Labor, together with its enclosures, appears of record in the case and seems to have served an important function. The letter referred to discussions of the Jelic case between officials of the two departments on February 9 and stated that there was being transmitted therewith a copy of a note of the same date from the Yugoslav Legation, "together with further evidence of the terroristic activities of Jelic," listing the enclosures, also that the Yugoslav Minister had informed the Department that he was convinced that the sole purpose of Jelic's desire to enter the United States was "to carry on terroristic propaganda and activities against high personalities in Yugoslavia." The enclosed note from the Royal Yugoslav Legation in Washington charged that the relator's entry in the country was for the purpose of "creating unrest among the Americans of Yugoslav origin" and concluded, "The Minister of Yugoslavia will be much grateful to the Secretary of State to take into consideration these facts and deny Jelic the entry into the United States." Other enclosures in the Secretary's letter included a poster, and translation thereof, of a political meeting and the Croatian almanac for 1939, with translation of certain pages, being claimed to have bearing on the political activities of the relator, and also a copy of a lengthy dispatch from the American Consulate General at Berlin, dated April 22, 1938, "concerning the attempt of Jelic to obtain a visa in the name of Andrija Artukovic."

At the close of the rehearing on February 20, 1939, the Board of Special Inquiry again voted to exclude the alien for the same reason as before, thus again denying his status as a visitor for a temporary stay in this country (as a "tourist" or "temporarily for business or pleasure," 8 U.S.C.A. § 203). The relator again appealed. On March 11, 1939, the Board of Review rendered its decision. It held that, so far as concerned the ground of exclusion found to exist by the Board of Special Inquiry, the alien's appeal must be sustained, because it was "quite clear from the facts recited that the claim of a non-immigrant status as a visitor has been fairly established by the affirmative testimony of the alien and his witnesses." It conceded that the Board of Special Inquiry, having had other claims before it, had rejected them in relying solely upon the stated reason for exclusion. Nevertheless, it considered that it must pass upon other claimed reasons for exclusion. As to the alien's political activities, it was held that there was no evidence to support the conclusion that "by reason of the alien's public utterances or writing or actions he has brought himself within the purview of the Act of October 16, 1918, as amended [8 U.S.C.A. § 137], requiring his exclusion under that Act." Since the respondent now makes no claim as to this ground of exclusion, as well as to the one relied on by the board of first instance, and since the evidence is so wholly in accord with the conclusions of the Board of Review, we may dismiss both of these grounds from further consideration.

The other claimed reason, dealing with the relator's actions in attempting in 1938 to secure a visa for his friend Andrija Artukovic and his statements concerning them at the hearing of February 20, 1939,

was, however, considered sufficient cause for his exclusion. The order was placed on the ground "that the alien admits the commission of crimes involving moral turpitude, namely, forgery and violation of Section 22(b) of the Immigration Act of 1924 [8 U.S.C.A. § 220(b)], to wit: personation of another." It was after the order of exclusion was thus affirmed that the relator sued out this writ of habeas corpus, which the District Court dismissed, saying that it appeared from the record "that the alien out of his own mouth admitted before the Immigration authorities to having committed offenses involving moral turpitude (forgery and personation)." The court also found that the record did not substantiate the alien's position that he did not receive a fair and impartial hearing. The relator's appeal from the District Court's dismissal of the writ brings these matters before us.

Since, after various vicissitudes, the order of exclusion was eventually rested solely upon the alien's admissions at the hearing of February 20, 1939, his testimony then becomes most important. He was examined, and testified through an interpreter in Croatian. First he was questioned as to whether he could return to Germany (he said he could and that he had left a $15,000 medical practice there in charge of an assistant) and as to his application for Hungarian citizenship, upon which his Hungarian passport was obtained. Then he was asked if he knew who Andrija Artukovic was. He explained that Artukovic was a friend persecuted by the German authorities to such an extent that he had to hide himself in Germany; that he had desired to come to the United States, where he had relatives; that the relator helped him as he could in connection with obtaining the American visa because Artukovic couldn't and didn't dare to appear personally at the American Consulate in Berlin, Germany, as he knew the German authorities would arrest him at once. So the relator intervened in 1938 at the American Consulate in Berlin for his friend, stating, "It was my intention to do something in favor of this man here with the American authorities because he is a victim of German persecution." Then ensued the following:

"Q. Did you go to the American Consul, taking his photographs? A. Yes.

"Q. Did you file an application there for your friend? A. Yes.

"Q. Did you sign his name to the application for the visa? A. I had his documents with me. The application was signed by him before I appeared at the Consulate.

"Q: When you appeared at the American Consulate, at first, did you say that you were Andrija Artukovic? A. Yes, in order to be able to appear before the Consul.

"Q. And how was it discovered that you were not Andrija Artukovic? A. They sent me to the medical officer where I told the doctor who was on duty there that I was not Andrija Artukovic and that I desired to speak to the Consul in this matter."

Next questions as to the number of times he tried to get a visa for Artukovic brought out the answers that he had represented his friend only this one time in the latter's application for an immigration visa. Then occurred the following passage, claimed by the respondent to contain the admissions justifying exclusion:

"Q. To that application, did you sign the name of Andrija Artukovic? A. Yes.

"Q. Was that a forgery, Dr. Jelic? A. I realized that but there was no other way to approach the American Consul and so far as I am concerned I regard it as my duty to save my friend.

"Q. Listen to this, Doctor. Section 22 (b) of the Immigration Act of 1924 reads as follows: 'Any individual who (1) when applying for an immigration visa or permit, or for admission to the United States, personates another, or falsely appears in the name of a deceased individual, or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name, or (2) sells or otherwise disposes of, or offers to sell or otherwise dispose of, or utters, an immigration visa or permit, to any person not authorized by law to receive such document, shall, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both.' Do you understand, Doctor? A. I fully realize the seriousness of the law read to me. However, when I appeared at the American Consulate in Berlin I did not know of that law but as I like the said Andrija Artukovic as if he would be my own brother I did that for the sole purpose to appear personally before the American Consul in order to explain to him the situation in which the said Andrija

Artukovic was at the time. Artukovic was for several years in jail in Belgrade, Yugoslavia, where he had no permission to speak to anyone. He was placed in a jail where he had to stay eight months in half a foot of water. If it hadn't been for the intervention of the French and British Embassies in Belgrade he would still be in prison. And after he was released the Serbians were trying to shoot him but he succeeded to leave the country for Hungary and after to Germany.

"Q. Do you admit Doctor that you committed forgery when you signed Andrija Artukovic's name to the immigration visa? A. I do, but it was done for a good purpose.

"Q. Do you know that forgery is a crime? A. Yes, I do but even our Lord would forgive me if I did do that."

Further examination dealt only with the relator's claimed political activities and with his Hungarian passport. In the course of this examination, there were introduced in evidence, or read into the record, the poster and the pages of the Croatian almanac contained in the letter from the Secretary of State of February 11, 1939, but no other parts of that communication or its various enclosures were presented. As has appeared, this line of questioning was unproductive of grounds for exclusion, though the Inquiry Board again voted to exclude the relator as a nonvisitor, a decision not sustained by the Board of Review.

 There are grave discrepancies in this record in important details which create doubt as to just what the relator did at the American Consulate in Berlin. The respondent concedes that the alien's admission that he committed forgery would not avail if, at the same time, he denied the elements of the offense. Indeed, it would seem to be clear that admissions of extensive legal conclusions (forgery and personation) made under pressure of an insistent cross-examination through an interpreter cannot constitute an admission of "having committed a felony or other crime or misdemeanor involving moral turpitude," under Section 3 of the Immigration Act of 1917, 8 U.S.C.A. § 136(e), if the facts testified to show an absence of any crime. It has been held that the admission must be "explicit and voluntary," United States ex rel. Castro v. Williams, D.C.S.D. N.Y., 203 F. 155, 157; Ex parte Rocha,

D.C.S.D.Tex., 30 F.2d 823, and hence exclusion was not justified where the alien refused to admit his guilt, although he had testified in another proceeding to facts from which guilt might be inferred, Howes v. Tozer, 1 Cir., 3 F.2d 849, or refused to affirm or deny guilt, United States ex rel. Castro v. Williams, supra, or admitted an offense (adultery) not a crime in the country where it occurred. In the Matter of Cathcart,[1] D.C.S.D.N.Y. (10 Misc. Docket S.D.N.Y. 335). An admission of something legally non-existent would seem as insufficient as any of these circumstances. True, the respondent relies upon the burden of proof placed upon the alien to establish that he is not subject to exclusion under any provision of the immigration laws, Section 23 of the Immigration Act of 1924, 8 U.S.C.A. § 221; but the story of the relator's visit to the American Consulate at Berlin was gone into by the examining inspector in such detail as the latter chose to require. A rule of proof as to the weight of the evidence cannot serve to reshape and reform a story so developed. The alien was being examined through an interpreter and without counsel; he was in the hands of the examining officials, who controlled the course of examination. It is this testimony upon which we must rely in an attempt to determine what actually took place.

The evidence at the hearing was that the relator appeared at the Consulate with the application of Artukovic and the latter's photographs, that the application either was signed by Artukovic before the visit to the Consulate (Jelic's first statement) or was signed, at some time undisclosed, by Jelic in Artukovic's name (his later statement), that he stated he was Artukovic in order to appear before the Consul, and that when sent to the medical officer he told the doctor (so far as appears, wholly voluntarily) that he was not Artukovic and that he desired to speak to the Consul in the matter. As the respondent concedes, nothing appears to show that the relator was not fully authorized by Artukovic to appear for him. That is the entire case except for the formal admission of forgery in signing Artukovic's name to the application and the relator's excuse that there was no other way to approach the Consul.

True, the Board of Review makes it appear that an admission of personation

---

[1] No opinion for publication.

was forced by the examining doctor and was made before a Consular board. It says: "The doctor at the Consulate immediately noted the difference between the individual before him and the person whose photograph appeared on the application, and upon the alien's (Jelic's) appearance before a Consular board, he admitted the impersonation." It is quite clear, however, that these two facts were not developed in the evidence at the hearing, but must have come from the dispatch of the American Consul of April 22, 1938, wherein they are stated. The Board suggested, also, that it may have been the relator's plan "to defraud the Consul by obtaining for himself the visa intended for his friend," but there is no support in the evidence for this charge. In fact, it is highly improbable. A physician of education and experience would hardly present an application in a friend's name and with his friend's photographs, with the idea of obtaining a visa for himself, which he was entitled to procure anyhow.

■ Under the circumstances, we feel that a hearing thus limited by the examining inspector and leaving so many unresolved doubts cannot be considered fair. The inspector was assiduous in securing the admissions which the letters made the basis for the rehearing had suggested, but he failed to bring out the actual facts. True, these hearings cannot be conducted with the strictness of a trial at law. But when there is a manifest conflict in the statements of the alien, it has been held that the conflict should be called to his attention and an explanation asked for. In Gonzales v. Zurbrick, 6 Cir., 45 F.2d 934, 937, where the alien testified through an interpreter, it was said: "Further, it occurs to us that, after the alien had at first denied that she was a prostitute, and afterwards had seemingly admitted that she was, it was unfair to have allowed the matter to rest there without having called her attention to this inconsistency and allowing her an opportunity to explain. Fair dealing suggests as much." Fair dealing in the present case suggests that an explanation should be sought not merely of the inconsistency of the two statements as to the signing of the application, but also as to the circumstances under which it was signed, and whether or not it was presented and in what manner and with what result. For there is no showing on Jelic's story, except obliquely and by extended inference or possible guess, that he ever used the signed application at all at the Consulate. The circumstances are important because under the statute, Section 7(f) of the Immigration Act of 1924, 8 U.S.C.A. § 207(f), each copy of the application shall be not only "signed by the immigrant in the presence of the consular officer," but "verified by the oath of the immigrant administered by the consular officer." No one claims or suggests that an oath was administered to Jelic. Hence there is no ground for a claim of perjury (though it was made originally, albeit somewhat hesitantly, in the dispatch of the American Consul). If, too, claim was to be made that an admission of personation was forced before a Consular board, that circumstance should have been developed.

■ In this connection, we think the procedure was further unfair and improper in that the Board of Review, as the internal evidence of its opinion shows, relied upon the Consular dispatch not in evidence before it. The statute is quite clear as to power of review on appeal from the action of a board of special inquiry; an appeal stays any action until the decision on appeal, "which shall be rendered solely upon the evidence adduced before the board of special inquiry." Section 17 of the Immigration Act of 1917, 8 U.S.C.A. § 153. "The substance of a fair hearing requires that all evidence used against an alien must be presented to him." United States ex rel. Hom Yuen Jum v. Dunton, D.C.S.D.N.Y., 291 F. 905, 907. The relator claims further that the Board of Review had no power to act on a ground of exclusion not found by the Inquiry Board below. But we doubt such a restriction. It goes beyond the explicit limitation in the statute and would be stultifying, as requiring admission of aliens against whom proceedings for deportation should immediately be brought. United States ex rel. Hom Yuen Jum v. Dunton, supra; Chew Toy v. Nagle, 9 Cir., 27 F.2d 513. The limitation against evidence outside the record is, however, vital and must be observed.

■ We think, therefore, that the order of exclusion was not to be sustained for lack of a fair hearing. Kwock Jan Fat v. White, 253 U.S. 454, 457, 458, 40 S.Ct. 566, 64 L.Ed. 1010. Further, though the result might be different on another hearing, we think the facts here adduced were insufficient in law to support the conclusions reached. As to the crime of persona-

tion, as defined by Section 22(b) of the Immigration Act of 1924, 8 U.S.C.A. § 220 (b), the alien did not admit the charge (which apparently, was quoted to him to press home the admission of forgery). What he said, in fact, was that he realized the seriousness of the law read to him, but that he did not know that law when he appeared before the Consulate, and that he did "that" (apparently "appeared at the American Consulate in Berlin") because of his regard for Artukovic and "for the sole purpose" of appearing before the American Consul. Moreover, there is, to say the least, grave doubt that the charge is true. It is not clear how far there was an appearance under an assumed or fictitious name in order to secure a visa, not merely to secure admission to the Consul. And the statute does not appear to be applicable in any event, since Dr. Jelic was not impersonating another for the purpose of securing his own admission to the United States, but only to assist his friend. Cf. United States v. Mouyas, D.C.S.D.N.Y., 42 F.2d 743, 744; McFarland v. United States, 6 Cir., 19 F.2d 807.

█ As to the crime of forgery, there is no showing of such crime under American law for the lack of a showing of the false making of a document with the necessary intent to defraud. Marden v. Dorthy, 160 N.Y. 39, 53, 54 N.E. 726, 46 A.L.R. 694, quoting 2 East, Pleas of the Crown, 852; People v. Wiman, 148 N.Y. 29, 42 N.E. 408. It was held in United States ex rel. Robinson v. Day, 2 Cir., 51 F.2d 1022, that the crime of forgery, involving the intent to defraud, was a crime of moral turpitude, justifying exclusion, but it was the intent which brought the crime within the Immigration Act. Such an intent can be deduced from acts, but here the alien's acts were left in doubt. In fact there is no evidence that Jelic used the application at all, for he first testified only that he *said* he was Artukovic in order to be able to appear before the Consul, and "they sent me to the medical officer," where he disclosed his identity. The later admission of forgery was based only upon *signing* Artukovic's name to the application, with no showing of use of the application. And as to intent, there is here only testimony of Jelic's purpose to secure admission to the presence of the Consul, one we cannot say is unreasonable in the light of the situation Artukovic was claimed to be in, especially since, if the intent was to secure

a visa for Artukovic, the steps taken by Jelic were quite the wrong ones for the purpose in view. They tended to make a simple task difficult, if not impossible, to hinder, not facilitate, Artukovic's admission to the United States. True, the American Consul's dispatch suggests, or perhaps charges, that such a course was actually in view, and a more adequate hearing might have shown a definite use of the application with the purpose of obtaining its acceptance as a step in securing Artukovic's admission to this country. But that does not appear from the present record.

█ The respondent claims that the law of the place where the claimed offense was committed must control, In the Matter of Cathcart, supra, and asserts that forgery under German law was shown. No evidence of the German law was presented at any of the proceedings. The respondent relies, however, upon a section of the German Penal Code, § 267, as applicable, and claims that the courts, under the new Federal Rules, Rule 43(a), 28 U.S.C.A. following section 723c, and the New York Civil Practice Act, § 391, may take judicial notice of the German law. But the rules have only a limited application by way of analogy to habeas corpus proceedings, Rule 81(a) (2), and the question is not as to the proceedings in the courts, but only as to the proceedings before the Department of Labor. As has recently been settled by the Supreme Court, the courts cannot proceed de novo upon habeas corpus, for the function of investigation and finding has not been conferred upon them, but upon the Secretary of Labor. Kessler v. Strecker, 59 S.Ct. 694, 700, 83 L.Ed. 1082. The lack of proof of German law cannot thus be supplied through the principles of judicial notice. Moreover, the section of the German Criminal Code cited applies only to a person who not only has forged a document of material importance, but also "who uses such document for the purpose of deception" (or "with intent to deceive," according to another translation presented to us by the respondent), and hence would seem to be substantially similar to our law in requiring proof of intent.

█ In its opinion, the Board of Review stated that the question of the alien's admissibility was not entirely free from doubt, but it relied upon the fact that the alien had not controverted "the conclusion which must be reached from the evidence

of record that forgery is a crime in Germany." The only evidence in the record was the alien's admission. Had the facts pointed to the crime of forgery under American law, the burden of explanation that the German law was otherwise might well be required of the alien, but it does not seem to us that under the circumstances facts showing an intent to defraud or deceive should be deemed supplied by a mere rule of procedure. Here to require of the alien, notwithstanding the indicated similarity of the two laws, that he assume the burden of proof of this technical legal issue and disprove the applicability of the German law seems to us particularly unfair when we recall that he did not speak our language and was denied counsel under Immigration Rule 12(B) (1). United States ex rel. Chew Deck v. Commissioner of Immigration, D.C.S.D.N.Y., 17 F.Supp. 78, affirmed in 2 Cir., 86 F.2d 1020, certiorari denied 300 U.S. 666, 57 S.Ct. 508, 81 L.Ed. 874. Rules of presumption and burden of proof are useful to support probabilities or to determine decision when the evidence is in equipoise; they cannot properly serve the function of making the less likely appear as the true.

The extensive search made in this case for a ground of exclusion follows, if it was not induced by, the request transmitted by the Department of State from the Royal Yugoslav Legation in Washington. In view of this request, a critical examination of the facts and law with regard to this alien would seem properly due the friendly power making it. Nevertheless, the obligation on the Government to see that legal grounds of exclusion exist is not lessened thereby, or else the rights of individuals, against even states and nations, which we in democracies take pride in safeguarding, would mean little in reality.

In view of the temporary nature of the alien's proposed stay in this country, the Secretary of Labor may not desire to proceed further in the matter. On the other hand, the Secretary may desire to have the issues of fact clarified by a further hearing. If so, we think she should have that opportunity, for the alien's admissions went sufficiently far that further explanation may reasonably be required and the deficiencies in this record supplied, if possible.

The order must be reversed and the case remanded to the District Court with directions to discharge the relator from custody unless the respondent gives him a fair hearing within a reasonable time to be fixed by the court.

CHASE, Circuit Judge (dissenting).

It is clear that the burden was upon the relator to show his right to enter this country. His admission that he had previously committed a crime in Germany involving moral turpitude would require his exclusion. 8 U.S.C.A. § 136(e). It was found that he did make such an admission and the scope of our review ought to be held to a consideration of whether the evidence supported the finding after the relator had been given a fair opportunity to be heard.

I fail to understand how there can be the slightest doubt that the relator deliberately attempted by fraud to obtain a visa for his friend Artukovic. The fact that Artukovic consented to the attempt to defraud in no way exculpates the relator. The law required the personal appearance of the applicant for the visa and the relator, representing himself to be the applicant, at first succeeding in deceiving the consular officials and was treated as though he were an applicant. That, of course, was why he was to be given the medical examination since it was to determine his physical fitness to enter this country. It was only when he had ample reason to believe that his fraud would be exposed by the examination that he ceased pretending to be Artukovic. The admission of such a brazen attempt to defraud this government, coupled with his admission that he knew what he did was a crime, gives ample support for the action of the Board and I think we are taking a long step in the wrong direction when a gloss is put upon that sort of conduct. The element of moral turpitude was inherent in the fraud. This appeal ought not to be treated as though he had been excluded after a failure by the government to prove that he had been convicted of an excluding crime with which he was charged and which he denied. As it is, his admissions alone are what count and speculation as to whether or not he admitted too much in the light of what may be the law in Germany seems to me to be only an unwarranted presumption of reversible error. It was for him to show such error affirmatively.

The relator was given two hearings and apparently made as full an explanation of his conduct as he could. Certainly he was given every reasonable opportunity to es-

tablish the pertinent facts and was excluded upon a ground adequately called to his attention and fairly explored. His difficulty is that he has twice failed to establish a right to enter and now he should be required to accept the consequences.

I would affirm the order.