In the Matter of David L. SWEDEN-
BORG and Sandra R. Swedenborg,
Debtors.

Carl RAFOTH, Trustee, Plaintiff,

v.

SMITH & SCHMIDT ASSOCIATES,
INC., Joseph P. Schmidt and
Howard A. Bartow, Defendants.

Bankruptcy No. B82–01112–Y.
Adv. No. 84–0105.

United States Bankruptcy Court,
N.D. Ohio.

Nov. 4, 1985.

David L. and Sandra R. Swedenborg, DeBois, Pa., debtors.

Claude W. Nicholson, Ashtabula, Ohio, for debtors.

Carl D. Rafoth, Youngstown, Ohio, for plaintiff/trustee.

Mark S. Gervelis, Ashtabula, Ohio, for plaintiff/trustee, Carl Rafoth.

Frederick S. Coombs, III, Youngstown, Ohio, for defendant Howard Bartow.

Joseph Lucci, Youngstown, Ohio, for defendants Smith & Schmidt & Associates, Inc., and Joseph P. Schmidt.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This matter is before the Court on the Motions for Summary Judgment filed by Defendants in the above-captioned adversary proceeding. For the reasons set forth below, the Motions for Summary Judgment are hereby sustained.

## FACTS

The facts in this case are somewhat complicated in that they span a period of some five years and came to light only after extensive discovery by the parties herein. Briefly, the scenario of events can be summarized as follows:

Defendant, Joseph Schmidt, is an officer and shareholder of Joe Schmidt Sales, Inc., the corporate successor to Defendant Smith and Schmidt, Associates, Inc. Joe Schmidt Sales, Inc., is a manufacturer's representative for various companies doing business with the automobile industry and acts as a middleman in the sale of products to the automobile industry. David Swedenborg, Debtor herein, was an employee and stockholder of Raser Tanning Company, a family-owned leather-related business which dissolved in June, 1979. In 1977, Swedenborg was heading up Raser's attempted entry into the automobile industry. Swedenborg, as vice-president of Automotive Sales, and Joseph Schmidt agreed that Smith and Schmidt Associates, Inc., would represent Raser Tanning on a commission basis in an attempt to sell leather interiors to Chrysler, Ford, and General Motors.

In December 1978, Smith and Schmidt Associates loaned David Swedenborg Twenty Thousand Dollars ($20,000.00). The transaction took place in Michigan. As collateral for the loan, David Swedenborg granted to Smith and Schmidt a security interest in sixty shares of Raser Tanning stock. A promissory note and pledge agreement were prepared and signed by the parties evidencing the loan, the stock certificate was endorsed, and a U.C.C. financing statement was filed in Michigan. The terms of the note provided that David Swedenborg was to make payments of Two Thousand Dollars ($2,000.00) plus interest two times a year until the loan was paid off.

At approximately the same time that this loan transaction occurred, Raser Tanning was experiencing financial difficulties. In his deposition, Joseph Schmidt stated that in the spring of 1979, he became concerned about the decline in value of the Raser Tanning stock held by him as collateral, and he requested from Swedenborg additional security for the loan. In May of 1979, Swedenborg gave Schmidt physical possession of a stock certificate representing twelve shares of stock in Conneaut Leather, Inc. This transaction occurred in Schmidt's office in Michigan. At the time Swedenborg delivered possession of the stock certificate to Schmidt, it was not endorsed, no new written pledge agreement

was prepared, and no new U.C.C. financing statement was filed. Schmidt retained possession of the Conneaut stock at all times from May of 1979 until subsequent to August 6, 1982. On that date, David Swedenborg filed a petition for relief under Chapter 7 of the Bankruptcy Code. Swedenborg scheduled Joe Schmidt Sales as a secured creditor holding twelve shares of Conneaut Leather stock as collateral for an obligation in the amount of Twenty Thousand Dollars ($20,000.00). Swedenborg valued the shares at Nine Thousand Dollars ($9,000.00) in the schedule.

Attorney Carl Rafoth was appointed trustee of the Swedenborg estate. At the first meeting of creditors, held pursuant to 11 U.S.C. Section 341 on August 26, 1982, the trustee requested proof that the twelve shares of Conneaut Leather stock were, in fact, pledged to Joseph Schmidt Sales, Inc. On October 6, 1982, Smith and Schmidt Associates sent David Swedenborg the stock certificate which had been in Schmidt's possession, along with a written amendment to the pledge agreement. The amendment was signed, the certificate was endorsed by Swedenborg, and the documents were returned to Schmidt. It appears that at this time, the signatures on the documents were back-dated to coincide with the time of the physical transfer. The documents were sent to the trustee, who then withdrew his objection to discharge. The trustee filed his Report of No Distribution on December 6, 1982, and the case was closed on June 3, 1983.

In November, 1982, Smith and Schmidt Associates contacted Conneaut Leather and requested a transfer of the ownership of the twelve shares of stock. In response to the request to transfer, Smith and Schmidt received an offer from Defendant Howard

Bartow, the president of Conneaut Leather, to purchase the twelve shares for Five Thousand Dollars ($5,000.00). This initial offer was declined. Bartow made a second offer to purchase the twelve shares for Nine Thousand Dollars ($9,000.00), which was accepted. On March 15, 1983, the shares were transferred to Joe Schmidt Sales, Inc., and immediately thereafter to Howard Bartow, on the corporate records. It is not disputed that, at the time he purchased the stock, Howard Bartow was not aware of the back-dating of the documents.

On August 6, 1984, the trustee applied to have the case reopened, alleging that he had just recently become aware that the twelve shares of Conneaut Leather stock had been transferred to Bartow in violation of the automatic stay.[1] The Court held a hearing on September 4 and granted the trustee's application to reopen on the same day. At the hearing, the trustee inadvertently saw a letter from Mr. Schmidt to Mr. Swedenborg directing the latter to execute the back-dated pledge agreement. On the basis of this, the trustee filed a complaint in three counts. Count One alleged that the actions of the Defendants constituted a fraudulent transfer under 11 U.S.C. Section 548. Count Two alleged that the actions of the Defendants constituted a fraudulent transfer under 11 U.S.C. Section 548. Count Two alleged that the actions of the Defendants constituted a preference under 11 U.S.C. Section 547. Count Three alleged that the fraudulent back-dating of the pledge agreement constituted a post-petition transfer of property under 11 U.S.C. Section 549. The Court entered an Order dismissing Counts One and Two, finding that the allegations of the trustee's Complaint referred to post-petition actions and

1. That the transfer to be avoided here is the pledge of stock from Swedenborg to Schmidt, and not from Schmidt to Bartow, has already been recognized by the Court in its earlier ruling of May 7, 1985. In that ruling, the Court stated that:
 This distinction is important. If the trustee were suing the defendants merely because the sale of stock to Mr. Bartow violated the automatic stay, then the doctrine of *Kinder v.*

*Scharff, supra,* might be applicable. There is evidence that the trustee knew of this transfer more than a year before he applied to re-open the case. The gravaman of the trustee's complaint, however, is that the defendants fraudulently back-dated the stock pledge agreement; thus, in effect, converting property of the estate valued at $30,000.00. Ruling on Motion to Dismiss, p. 6, ftnt. 2.

that 11 U.S.C. Sections 547 and 548 apply only to pre-petition actions. The trustee subsequently filed an amended complaint, "pursuant to 11 U.S.C. Section 549, 11 U.S.C. Section 541, 11 U.S.C. Section 152, Chapter 1336 of the Ohio Revised Code, common law fraud, and 11 U.S.C. Section 548 (such that the transfer is deemed to have been made immediately prior to filing of the petition pursuant to Section 548(d)(1)," and prayed for the return of the property from Howard Bartow or its value from Schmidt.

## LAW

### 1. THE VOIDABILITY PROVISIONS UNDER TITLE 11.

█ Since the main thrust of the trustee's Complaint is that the actions of the Defendants constituted an unauthorized post-petition transfer of property of the estate, we deal with those allegations first.

11 U.S.C. Section 549 states, in pertinent part:

> (a) except as provided in subsections (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
> (1) made after the commencement of the case; and;
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> (B) that is not authorized under this title or by the court.

Thus, under Section 549, unauthorized post-petition transfers of property of the estate are voidable.

The parties do not dispute that the physical transfer of the stock to Joseph Schmidt occurred in May, 1979 in Michigan. It is likewise not disputed that the amendment to the pledge agreement was not signed until October, 1982, that David Swedenborg did not endorse the stock certificate until October, 1982, and that those documents were back-dated. Summarily, the trustee's position with regard to the allegations under Section 549 is that physical transfer of the stock in May, 1979 was not, in and of itself, adequate to create a security interest

in the Conneaut Leather stock and that the security interest was created post-petition when the amendment to pledge agreement was signed and the stock certificate endorsed by David Swedenborg, thus constituting a voidable, post-petition "transfer" of property under Section 549.

█ Defendants argue that physical possession of the stock was sufficient to create a valid security interest and that, therefore, there was no post-petition transfer of property of the estate. Thus, the dispositive issue in this case is whether Schmidt's acquiring physical possession of the Conneaut Leather stock certificate in May, 1979 was enough to create a valid, enforceable and perfected security interest at that date, thereby carrying the transaction out of the voidability provisions of Section 549. Defendants Smith and Schmidt Associates, Inc., and Joseph P. Schmidt argue that Article 8 of the Uniform Commercial Code—Investment Securities—is the relevant law pertaining to corporate stock and a security interest in that stock, and cites to numerous Article 8 Code sections with parallel citations to the Ohio Revised Code. Inasmuch as Defendants rely upon Ohio law to determine the status of the parties, the trustee has objected and argues that, instead, Michigan law is to be applied since that was the state in which the transfer of the stock certificate occurred. We agree with the trustee and hold that Michigan law as it existed in May of 1979 is to be applied to this transaction. *See generally,* 18 Am.Jur.2d. *Corporations,* Section 377 (1965).

Defendants rely upon Section 8–321 of the Uniform Commercial Code as governing the enforceability, attachment, perfection and termination of security interests in securities. That Code section has never been adopted by Michigan. We must turn, instead, to Article 9 of the U.C.C. (Secured Transactions) as it existed in that state in 1979.

Section 440.9102 of the Michigan Compiled Laws states:

(1) Except as otherwise provided in section 9104 on excluded transactions, this article applies

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including ... instruments....

(2) This article applies to security interests created by contract, including pledge....

Mich.Comp.Laws Ann. Section 440.9102 (West 1967 & Supp.1985). Under Section 440.9105(1)(g), securities such as the Conneaut Leather stock are included in the category of "instruments."

'Instrument' means ... a security (defined in Section 8102)....

Mich.Comp.Laws Ann. (West 1967 & Supp. 1985). There is no doubt that stock such as the Conneaut Leather stock is a security as defined in section 8102 of Article 8.[2]

Under the terms of Michigan Uniform Commercial Code Section 440.9304, a security interest in instruments is perfected through the secured party's taking possession:

Sec. 9304. (1) A security interest in chattel paper or negotiable documents may be perfected by filing. A security interest in money or instruments (other than instruments which constitute part of chattel paper) can be perfected only by the secured party's taking possession, except as provided in subsections (4) and (5) and sections 9306(2) and 9306(3)[1] on proceeds.

Mich.Comp.Laws Ann. (West 1967 & Supp. 1985).

In addition, Section 440.9305, dealing with the perfection of security interests through possession of the collateral, states, in part:

A security interest in letters of credit and advices of credit ..., goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral.

Mich.Comp.Laws Ann., Section 440.9305 (West 1967 & Supp.1985). Finally, Section 440.9302 provides that:

(1) A financing statement must be filed to perfect all security interests except the following:

(a) a security interest in collateral in possession of the secured party under Section 9305....

Mich.Comp.Laws Ann., Section 440.9302 (West 1967 & Supp.1985).

 Thus, under Michigan law, stock is included within the definition of "instrument" and a security interest in instruments is perfected upon the secured party's taking possession of the instrument, with no filing required.

To dispel any doubt as to whether a writing is necessary to create a security interest in stock, Section 440.9203 provides:

(1) Subject to the provisions of section 4028 on the security interest of a collecting bank and section 9113 on a security interest arising under the article on sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...; and

(b) Value has been given; and

2. Section 440.8102 provides:

(1) In this article unless the context otherwise requires (a) a 'security' is an instrument which
(i) is issued in bearer or registered form; and
(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and
(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer. Mich. Comp.Laws Ann. Section 440.8102 (West 1967).

(c) The debtor has rights in the collateral.

Mich.Comp.Laws Ann., Section 440.9203 (West 1967 & Supp.1985).

■ The practice commentary to Section 440.9203 states that

"the security agreement must be in writing. This is a statute of frauds. There are several exceptions to this writing requirement. *A pledge arrangement need not be in writing if the collateral is actually in the possession of the secured party.* (Emphasis added).

Mich.Comp.Laws Ann., Section 440.9203, *Practice Commentary* (West 1967). Thus, as long as the secured party has possession of the collateral pursuant to an agreement and has given value, a valid and perfected security interest arises. We also note that the fact that the transferor may fail to endorse the certificate at the time of delivery is of no effect, as Section 440.8307 provides the transferee with a specific right to compel endorsement as against the transferor.[3]

Several courts have considered when a security interest in stock is perfected. The Sixth Circuit has concluded that under Article 9 of the Florida Uniform Commercial Code, the perfection of a security interest in stock is complete upon the secured party's taking possession of that stock alone. *Wilkie v. Brooks,* 515 F.2d 741 (6th Cir. 1975), cert. den. 423 U.S. 996, 96 S.Ct. 423, 46 L.Ed.2d 370 (1975); *see also Lovett v. Shuster,* 633 F.2d 98 (8th Cir.1980).

■ The trustee argues that even if a writing is not required and a security interest can be created by possession alone, the formal requisites under Section 440.9203 have not been met in that there was no "agreement" between the parties to create a security interest in the Conneaut Leather stock at the time David Swedenborg delivered it to Joseph Schmidt. Upon review of the depositions of David Swedenborg and Joseph Schmidt, we can come to no other conclusion but that the delivery of the Conneaut Leather stock to Joseph Schmidt in May of 1979 was in fact, intended to act as additional security for the loan made in December of 1978.

Section 1201(3) defines "agreement" as follows:

(3) 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances, including course of dealing or usage of trade or course of performance as provided in this Act. . . .

Mich.Comp.Laws Ann., Section 440.1201 (West 1967).

Since there was no writing to determine what the "bargain of the parties" was, we are directed to determine the essence of the bargain by implication. We hold that the only reasonable interpretation of the facts as set forth in the depositions of Joseph Schmidt and David Swedenborg is that the parties intended the stock to be additional collateral for the loan.

Joseph Schmidt testified as follows:

Q And were these additional shares added as additional security?

A Well, yes. My attorney recommended, being that Raser was no longer in the business, and I had to have some more security; so this is what we got in the way of collateral. (Dep.—Joseph Schmidt p. 24).

Later in his deposition, Schmidt reiterated the fact that he was taking the Conneaut stock as collateral with the following:

A I don't know if David was in bankruptcy. All I know is that the company was in financial difficulty; okay? Now, I can't say for sure at that time I knew he was in bankruptcy, okay? I don't have any time frame that I can remember. I knew

---

**3.** Sec. 8307. Where a security in registered form has been delivered to a purchaser without a necessary indorsement he may become a bona fide purchaser only as of the time the indorsement is supplied, but against the transferor the transfer is complete upon delivery and the purchaser has a specifically endorceable right to have any necessary indorsement supplied. Mich.Comp.Laws Ann. (West 1967).

that they were having problems, and that's why we initiated that, asked for more collateral. (Dep.—Joseph Schmidt p. 37).

David Swedenborg testified as follows:

Q Did you at any time give or pledge to Joe any collateral aside from the Raser Tanning collateral?

A Collateral as such, no.

Q Did you give Joe stock in any other company?

A Yes.

Q And what was that company?

A Conneaut Leather Company.

Q When was that?

A That was prior to the meeting of the creditors of Raser; probably sometime in May, I would guess, of '79. I don't remember the exact day. I was in Michigan with Joe.

Q You gave Joe Conneaut Leather stock. Tell me exactly what you did at that time in May of '79, in reference to the Conneaut Leather stock and Joe Schmidt.

A Joe, as we indicated, was aware of the situation at Raser. He was deeply involved in it. I was in his office, and I had brought the Conneaut Leather stock with me and told Joe I was continuing to pay my debt to him as we agreed. And that I would have him hold the Conneaut stock because the Raser stock was going to be no good unless we saved the company.

Q It was your intention that Joe hold that Conneaut stock as more valuable or more secure collateral since the Raser stock was essentially becoming very worthless?

A I gave it to Joe because I wanted to show Joe that, as he had trusted me and gave me money, I wanted to show him that I was still intending to fulfill any obligations I had to him.

Q And you intended him to hold the stock as collateral for the loan?

A Hold the stock. He put it in his desk drawer and said 'It's right here.' (Dep.—David Swedenborg pp. 20, 21).

Continuing, Swedenborg testified:

Q Did you, in May of 1979, give Joe physical possession of Conneaut Leather stock?

A Yes.

Q For what purpose?

A I told Joe that I wanted him to hold this stock while I paid off his debt.

Q Because the Raser Tanning stock was declining in value?

A Correct.

Q Do you know how many shares of Conneaut Leather stock you gave to Joe in May of 1979?

A Twelve shares. (Dep.—David Swedenborg pp. 21, 22).

Q Why did you give him the Conneaut Leather certificates?

A Because the stock, the Raser stock, had decreased in value; and the Conneaut stock had value.

Q You intended for Joe to hold the Conneaut as collateral for your loan to him?

A No, we never discussed collateral.

Q You didn't intend for him to hold it as collateral?

A Well, Joe was a friend; and as the good faith that he had shown in trying to work out the problems at Raser and save this whole, at that time, mess, he had lent me money, and because I saw the Raser stock going down in value in something he had a secured possession with, Raser stock, I, of my own thought, was that, *'Joe, there's 12 shares of stock that have value for you. Hold them while I pay off this debt.'* Otherwise, *he had nothing.* (Emphasis Added).

Q Otherwise he had nothing?

A The Raser stock was of no value to him.

Q And you gave him stock for the period of time you paid off the debt? Your intentions were to give him the

Conneaut stock for the period you paid off your debt to him?

A Uh-huh.

Q And if you paid off the debt, what did you expect to happen to the stock?

A Well, he put it in his desk drawer and said, 'I'll keep it right here, and when you pay it off, I'll send it to you.'

Q Did you have any dispute with that position?

A No.

Q You intended him to keep it until the obligation was paid?

A Yes. (Dep.—David Swedenborg pp. 36, 37).

Q Mr. Swedenborg, I would like to direct your attention in that bankruptcy petition, marked as 'Defendant's Joint Exhibit No. 4, to Schedule A–2, Creditors'—

A Holding security?

Q Holding security, correct. Will you identify the sixth creditor on that list?

A Joseph Schmidt Sales.

Q What is the collateral that you have indicated in your bankruptcy petition?

A Twelve shares of stock in Conneaut Leather Company.

Q And what is the market value of those 12 shares?

A It was stated at that time as $9,000.

Q And what is the amount of the debt which is stated which is owed to Joseph Schmidt Sales?

A $20.000.

Q Mr. Swedenborg, I would like you just to turn the page over to Amended Schedule A–2.

A Yes.

Q Once again, is Joseph Schmidt Sales designated as a secured creditor on that page?

A Yes, they are.

Q And once again, the collateral for Joseph Schmidt Sales—

A Is 12 shares of stock in Conneaut Leather Company stock.

Q And once again, the value?

A $9,000.

Q And the amount of the obligation?

A $20.000.

Q Is it your understanding, Mr. Swedenborg, that those creditors designated on Schedule A–2, Creditors Holding Security, were and are those creditors that had a security interest in property which you owned?

A Yes.

Q Which included Joseph Schmidt Sales?

A Yes. (Dep.—David Swedenborg pp. 32, 33—Defendants Jt.Ex. # 4).

There is no other reasonable interpretation to be given to the parties' testimony but that they intended to create a security interest in the Conneaut Leather stock in May of 1979. Despite David Swedenborg's attempt to equivocate on the parties' intent regarding Joseph Schmidt's holding the Conneaut Leatherstock, we find that David Swedenborg's statement that he intended Joseph Schmidt to hold the stock until the loan was paid off lest Joseph Schmidt have nothing (due to the fact that the Raser Tanning stock was of no value) establishes that David Swedenborg intended Joseph Schmidt to have a security interest in that stock. The fact that he doesn't speak in terms of "collateral" is of no effect here. "Collateral" is a term of art, and the fact that lay parties do not use that term to describe their transaction does not support a conclusion that no security interest was intended. The actions of these two businessmen speak for themselves.

The trustee argues that the following of all of the formalities concurrent with the pledge of Raser Tanning stock and the failure to follow the same formalities in the transaction with the Conneaut Leather stock indicates that the parties did not intend to create a security interest in the Conneaut Leather stock. The Court is of the opinion that no such conclusion is to be drawn from that fact. We simply attribute

the lack of formality in the latter transaction to the fact that no attorneys were involved at that time.

■■■ We find that the facts could lead to no other conclusion but that the parties intended to create a security interest in the Conneaut Leather stock in May, 1979. Since the requisites set forth in Section 440.9203 have been met, we hold that there was a valid, enforceable and perfected security interest in the Conneaut Leather stock at the time David Swedenborg effected physical delivery of that stock to Joseph Schmidt in May, 1979. Post-petition execution of the amended pledge agreement simply ratified in writing the pre-petition agreement between the parties. It granted no greater (or lesser) interest in the Conneaut stock to Schmidt.

Since we hold that the "transfer" occurred in May, 1979 and not post-petition as the trustee alleges, the trustee's reliance on Section 548(d) as a basis for his Complaint is moot.

We note at this point that one ground upon which the trustee based his complaint was 11 U.S.C. Section 152. Since no such Code section exists, we disregard that part of the Complaint.

## 2. THE FRAUDULENT CONVEYANCE PROVISIONS OF CHAPTER 1336 OF THE OHIO REVISED CODE.

In his Complaint, the trustee alleges that the transactions involved in this case constitute a fraudulent conveyance under Ohio Revised Code Chapter 1336. The trustee does not specify which provisions of Chapter 1336 have been violated, nor has he specified how the transactions constituted fraudulent conveyances. From a reading of the Complaint and a review of Ohio Revised Code Chapter 1336, however, the Court determines that the trustee is relying upon Sections 1336.04 (Conveyance Resulting in Insolvency) and 1336.07 (Intent to Defraud).

■■■ Reading the trustee's Complaint, it is obvious that, at the time the Complaint was filed, the trustee believed that the physical transfer of the stock was effected concurrently with the execution of the written amendment to the pledge agreement and the back-dating of the documents. Had this been the fact, we may have reached a different conclusion as to the motions for summary judgment. However, since Schmidt did in fact hold a valid, perfected security interest as of May, 1979 (more than three years prior to Swedenborg's filing a petition for relief under Chapter 7), our inquiry ends there. The uncontroverted facts do not support the trustee's allegations that the transfer occurred post-petition. It necessarily follows that the facts do not support a conclusion that the transfer was made with the intent to defraud creditors, in violation of O.R.C. Section 1336.07, or that it was made at a time when David Swedenborg was insolvent or thereby rendered him insolvent, in violation of O.R.C. Section 1336.04. There is no evidence that could possibly support a finding that David Swedenborg attempted to defraud his creditors when he delivered the stock certificate to Schmidt in May, 1979. On the contrary, Schmidt testified that he felt himself to be undersecured. Swedenborg testified that he wanted to assure Schmidt, as a friend, that the debt would be paid. There is, likewise, no evidence that Swedenborg was rendered insolvent by virtue of the transfer. Indeed, he did not file bankruptcy until more than three years after the transfer. By no interpretation of the facts could we conclude that transfer of the stock to Schmidt in May, 1979 constituted a fraudulent conveyance under O.R.C. Chapter 1336.

The trustee also takes issue with the transfer from Schmidt to Bartow in March of 1983. The gravamen of the trustee's complaint as to this transfer is that Bartow bought the stock with knowledge of the bankruptcy, knowledge of the value of the stock, knowledge of the fraudulent stock pledge, and that he contributed to the defrauding of creditors of the estate by purchasing the stock for less than adequate and fair consideration.

These allegations have already been considered by Judge Harold White in his May 7, 1985, ruling on Defendant Bartow's Motion to Dismiss. In that ruling, Judge White noted that the transfer at issue in this case is not the sale of stock to Mr. Bartow, but rather the alleged post-petition pledge of stock to Smith & Schmidt Associates. Judge White held that this distinction was important because, if the trustee was taking issue with the sale of stock to Bartow, the doctrine of *Kinder v. Scharff,* 231 U.S. 517, 34 S.Ct. 164, 58 L.Ed. 343 (1913) might be applicable. In *Kinder,* the Court held that the statute of limitation of then-section 11(d) of the Bankruptcy Act, as amended, barred the trustee from reopening a case which had been closed for more than two years where the purpose of reopening was to bring an action to recover an alleged fraudulent conveyance. In reaching its decision, the Supreme Court specifically found that the trustee had suspected fraud but had decided the claim was not worth pursuing. The Supreme Court held that the trustee should not be able to reopen a case to pursue a claim of which he had knowledge while the case was open but which he had undervalued.

In the instant case, there is evidence that the trustee knew of the transfer to Bartow, and of the terms of that transfer, more than a year before he applied to have the case reopened. Since that is the case, we hold that the doctrine of *Kinder v. Scharff, supra,* does indeed apply and that the trustee cannot now contest the terms of the sale to Bartow. He had knowledge of those facts at least as early as July, 1983, the date which the trustee sent a letter to an Attorney Gary Gilmartin and indicated that the stock had been sold to Bartow for approximately Eleven Thousand Dollars ($11,000.00).

## 3. THE ROLE OF SUMMARY JUDGMENTS.

The basic purpose of the Federal Rules of Civil Procedure is stated in Rule 1 which provides, in part, that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Consistent with this stated philosophy, Rule 56, Fed.R.Civ.P., provides for the granting of judgment on motion for summary judgment by a party without the necessity of expending time and financial resources unnecessarily. Rule 56(c), Fed.R. Civ.P., provides, in part, that

> The judgment sought *shall be rendered forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Emphasis added).

Rule 56 on its face strongly supports the use of summary disposition of cases before the federal courts. Despite this, there are a number of doctrines that have grown up in the case law which discourage the use of summary judgments in practice. 10 Wright, Miller & Cain, *Fed. Practice & Procedure,* Sec. 2712, at 582 (2d. ed. 1983). Most often, summary judgment is denied on the basis that it constitutes "trial by affidavit" and that it is no substitute for the "even-handed justice" which a full trial will give a party. *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Although the *Poller* decision is often cited as a general admonition against summary judgment, a review of the case shows the contrary. In that case, the Supreme Court held summary judgment was inappropriate in that case for the reason that (1) it was a complex anti-trust case, (2) motive and intent of the parties were material, factual issues, (3) the alleged conspirators, rather than the plaintiff, were in sole possession of the bulk of the determinative evidence, and (4) assessment of the credibility of witnesses was essential to determining the factual basis upon which the case could be judged. *Poller v. Columbia Broadcasting Sys., Inc.,* op cit, p. 473, 82 S.Ct. at 491. The Supreme Court is merely pointing out that in the factual setting of that case, the granting of summary judgment was wholly inappropriate. Thus, what we learn from *Poller* is that it was not an appropriate

summary judgment case and not that "trial by affidavit" is to be wholly discouraged, as *Poller* is often misinterpreted and misapplied. This more-realistic view of *Poller* is recognized by the lower courts. *Lupia v. Stella D'Oro Bisquit Co.*, 586 F.2d. 1163, 1166–67 (7th Cir.1978); *cert. den'd.*, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979).

Courts often decline to grant summary judgment, even where the *dispositive facts* are not in dispute. One of the earliest of the cases often cited is *Doehler Metal Furniture Co. v. United States*, 149 F.2d. 130 (2d. Cir.1945), where the court stated, at page 135, that "a litigant has a right to a trial where there is the slightest doubt as to the facts." It is apparent that the "slightest doubt" standard is overstated if it is taken out of the context of the *Doehler Metal Furniture Co.* decision. If it is taken literally, the text means that summary judgment will almost never be used even, as now, when our legal resources are strained. *Chubbs v. City of New York*, 324 F.Supp. 1183, 1189 (S.D.N.Y.1971). One commentator has pointed out that since plaintiffs in a civil case must only persuade by a preponderance of the evidence, Rule 56 leaves substantial room for argument over the genuineness of facts before there is a "genuine issue" under the Rule. Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745, 748 (1974) (arguing that judges ought to weigh determinations, the genuineness of fact issues and summary judgment settings based upon which party has the burden of proof at trial).

Parties opposed to summary judgment often caution the courts that "summary judgment is an extreme remedy which should be sparingly employed." *Giordano v. Lee*, 434 F.2d. 1227, 1230 (8th Cir.1970), *cert. den'd*, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709. That decision is typical of decisions which suggest that granting a motion for summary judgment is an extreme or far-out action of the court. Those suggestions, however, tend to ignore the clear statement of Rule 56 that "the judgment sought shall be rendered forthwith

... if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." However, in a case where there is no genuine issue of *material fact* and there is no genuine argument as to which party is entitled to judgment as a matter of law, "summary judgments are looked on with favor." *Freeman v. Continental Gin Co.*, 381 F.2d. 459, 469 (5th Cir.1967).

Another of the often-heard reasons for denying summary judgment is that the "inferences to be drawn from underlying facts ... must be viewed in light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, such inferences must be reasonable or legitimate and should not be based on speculation or conjecture. The provisions of Rule 56(e) state that the party opposing summary judgment may not rest upon allocations or denials of pleadings, but must, by affidavit or otherwise, "set forth specific fact showing that there is a genuine issue for trial." Especially where, as here, the judge considering the motion for summary judgment is also the judge who would consider the case at trial, the inferences drawn from the evidence should be given great weight. The judge must determine from the available evidence whether a reasonable inference drawn on consideration of a motion for summary judgment would likely be altered upon hearing direct testimony rather than merely considering affidavits of opposing parties taken on cross-examination. In this case, as has been shown hereinbefore, my conclusion is that the inferences drawn from the facts now before the Court would not likely be changed by hearing further testimony about dispositive facts which are not really in dispute between the parties.

Although this case would appear, at first blush, to be very complex, an in-depth review of the depositions and documentary evidence available to the Court for consideration of this motion for summary judgment lead the Court to conclude that there is little dispute as to the dispositive facts. Upon a review of this case, it is the Court's

conclusion that material facts are not in genuine dispute as to the dispositive aspects of this case.

Summary judgment is hereby granted in favor of Defendants Smith & Schmidt Associates, Joseph P. Schmidt and Howard Bartow and against the trustee on all Counts of the Complaint.