In re WILLIAM A. SMITH CONSTRUC-
TION COMPANY, INC., Debtor.

HALLIBURTON COMPANY, Plaintiff,

v.

WILLIAM A. SMITH CONSTRUCTION
COMPANY, INC., et al., Defendants.

Bankruptcy No. B87–2310.
Adv. No. B87–0391.

United States Bankruptcy Court,
N.D. Ohio, E.D.

April 29, 1988.

Edward R. Brown, Howard Coburn, Ar-
ter & Hadden, Cleveland, Ohio, for plain-
tiff.

Dennis P. Zapka, Frutig, Polito & Travis,
Cleveland, Ohio, for trustee.

David C. Eisler, Cleveland, Ohio, for de-
fendant U.S. Trade Center Corp.

Irving Bergrin, Cleveland, Ohio, for de-
fendants G. Harris, J.L. Ray, M. Kotula, J.
Bettio and D. Emanuel.

### MEMORANDUM OF OPINION
### AND ORDER

RANDOLPH BAXTER, Bankruptcy
Judge.

Halliburton Company (Halliburton), a se-
cured Creditor of William A. Smith Con-
struction Co., Inc. (Debtor), seeks relief
from stay under 11 U.S.C. § 362(d) in order

to exercise its pledge agreement with Debtor. The original Complaint for Declaratory and Injunctive Relief and for Relief From Stay filed by Halliburton named the Debtor, U.S. Trade Center Corporation (U.S. Trade), U.S.T.C. Corporation, Gary Harris, Michael Kotula, Jack Bettio, David Emanuel, and James L. Ray. By stipulation of the parties, Defendants U.S.T.C. Corporation, Jack Bettio, Michael Kotula, David Emanuel, and Gary Harris were dismissed as parties Defendant (Stipulated Dismissals, etc. filed February 11, 1988) prior to the trial. Upon argument of counsel, and an examination of the record of all matters admitted into evidence and all relevant pleadings, the Court renders the following findings pursuant to Rule 7052 of the Bankruptcy Rules:

## I.

This adversary proceeding is a core matter under 28 U.S.C. §§ 157(b)(2)(A), (G), and (O). Jurisdiction is further found under 28 U.S.C. § 1334 and General Order No. 84 of this District.

Halliburton, located in Dallas, Texas, was the owner of the Debtor corporation prior to April, 1986, when Halliburton sold 6,000 shares, constituting a 100% equity interest in the stock of the Debtor, to four investors as follows:

| No. of Shares | Original Shareholder | Assignee |
|---|---|---|
| 5,000 | Smith (Debtor) | No assignment |
| 300 | Charles C. Smith | " " |
| 300 | Joseph E. Lo Conti | U.S. Trade Center Corp. |
| 300 | Earl Spencer | " " " " |
| 100 | James L. Ray | " " " " |

The documents evidencing this sale were (1) the Stock Purchase Note (PX 2) which indicated a purchase price of $375.00.00, $100,000.00 of which was to be paid in cash and the $275,000.00 balance in the form of a promissory note payable over a three-year period with the last installment due March 30, 1989; (2) a secured Note (PX 4) of $3,422,000.00 evidencing the existing intercompany indebtedness due from the Debtor to Halliburton as of April, 1986. This note was also payable in installments over three years, the last installment being due March 30, 1989; and (3) execution by the Debtor and each of the four new stockholders of a Pledge Security Agreement and perfection of the pledge by Halliburton's retention of all 6,000 shares as authorized under Section 9.304 of the Texas Business and Commerce Code. (PX 3 and PX 5).

Security for the sale was provided by Debtor and the purchasers in two ways: (1) Debtor granted a security interest in its accounts receivable and in its equipment to secure the $3,422,000.00 Secured Note; and (2) the Stock Pledge Security Agreement secured not only the $275,000.00 Stock Purchase Note but also the $3,422,000.00 Secured Note. It provided that a default under the Secured Note constituted a default under the Pledge Security Agreement, entitling the pledgee to exercise its rights as to the stock.

The $275,000.00 Stock Purchase Note was payable as follows:

(i) $50,000.00 plus accrued interest on the unpaid principal balance at the rate of eleven (11%) per annum on June 30, 1986.

(ii) $75,000.00 plus interest at the same terms on October 30, 1986, March 10, 1988, and March 30, 1989.

The terms of the Secured Note, exclusive of eleven (11%) interest on the unpaid balance, consisted of regular payments with the last payment due March 30, 1988.

By the Fall of 1986 the Debtor was delinquent on its payments under the Secured Note. No payments were received after February, 1987. As of May 27, 1987, installments due under the Secured Note were in arrears in the principal amount of $1,232,000.00, and Halliburton gave notice of acceleration of the Secured Note unless all arrearages were paid within ten days. (PX 7.) On June 22, 1987 Halliburton gave notice of its intent to exercise its rights under the cross-default provisions of the Pledge Security Agreement. (PX 8).

As of June 30, 1987, the outstanding principal balance on the stock purchase note was $150,000.00 and on the Secured Note $2,006,225.00. Interest on both notes as of that date was $11,846.29 and $199,315.99, respectively. (PX 9.) On July 1, 1987, the Debtor caused to be filed a petition in bankruptcy under Chapter 11, and

any further action by Halliburton was thereby stayed under 11 U.S.C. § 362. A trustee was later appointed in the bankruptcy proceedings pursuant to § 1104 [11 U.S.C. § 1104].[1]

Halliburton has resolved its dispute as to the ownership of the stock of Charles C. Smith. (*See*, Plaintiff's trial brief; Deposition of Charles Smith at 55–56.)[2] At issue is a determination of whether Halliburton has the right to enforce its pledge relative to the stock held by the Debtor.

## II.

The dispositive issues for the Court's determination are two-fold. The first, whether Halliburton holds a valid and enforceable pledge of all of Debtor's stock, is disputed by the Trustee. He asserts that Halliburton failed to meet its burden of establishing that Emil Zerr was the duly elected president of the Debtor with authority to bind the Debtor to the pledge agreement which Zerr signed on behalf of the Debtor. Whether Halliburton is entitled to relief from stay to enforce the pledge agreement under State law and to sell the stock is disputed by U.S. Trade and James Ray. These persons advance equitable arguments that Halliburton did not deal with the buyers in good faith and that it exercised undue control over the Debtor.

### A. *Validity of Pledge*

■ At issue is the validity of the Stock Pledge Agreement which E.M. Zerr executed on behalf of the Debtor. (PX 3.) The minutes of a telephonic meeting of the Debtor's Board of Directors, held March 6, 1986, indicate that the Board unanimously approved the election of E.M. Zerr as president on that date. (PX 10.) This action was taken, according to testimony of Richard Sitton, to enable Charles Smith, the former president, to gain access to his pension fund and receive entitlement to medical insurance upon retirement. Thusly, Zerr's election was valid and was approved by the duly constituted Board of Directors.

Richard Sitton is Halliburton's manager of corporate development who had primary responsibility for negotiating the sale of Debtor corporation and overseeing debt payments. He was the sole live witness at the hearing. The Trustee called no witnesses and no contrary evidence was adduced to refute this finding.

■ Trustee further asserts that, pursuant to Article 2.42 of the Texas Business Corporation Act, the president of the corporation has no power to bind the corporation in the absence of authority in the act of incorporation or from the board of directors. There is no need to consider whether Zerr had authority, *ab initio*, since his execution of the Pledge Agreement on behalf of the Debtor was ratified by all the new shareholders. (*See* DX H, J, and K.) The new shareholders formed a Board of Directors and in two shareholder resolutions, DX H and J, expressly ratified all transactions entered into by the Debtor prior to and on the closing. The ratification resolution was given to Sitton at the time of the closing. These resolutions were adopted by unanimous written consent of the Directors in lieu of a meeting. (DX L.) Ratification is further evidenced by the behavior of the parties. Debtor's profits were used to pay the indebtedness on the secured note. Debtor acknowledged its indebtedness in its Statement of Affairs filed in the bankruptcy proceeding. (*See*, Question 13(a) outlining payments made on secured note and purchase money note.) Halliburton's claim of $2,328,882.00 is listed as disputed, but it is the only secured debt noted on the summary sheet.

Debtor made three proposals for restructuring or buy-out of the debt to Halliburton. A proposal of $1.5 Million Dollar buy-out made in Spring, 1987, was rejected because it represented less than fifty cents on the dollar of what was owed. (Cross-examination of Richard Sitton). In early April, 1987, a written work-out plan consisting of small payments which would not cover the interest on the debt followed by a

---

1. *See*, Order dated August 24, 1987.

2. The record is silent as to whether an accommodation has been reached with Joseph Lo Conti and Earl Spencer.

balloon payment was likewise rejected. (Deposition of Richard Sitton, Tr. p. 167 and Sitton trial testimony.) This was followed by a verbal offer of $800,000.00 for the Company, also rejected because it would have provided only thirty cents on the dollar. At no time prior to the filing of this adversary proceeding did Debtor raise the question of the validity of the pledge.

"Where a party gives a reason for his conduct and decision touching anything involved in the controversy, he cannot, after litigation has begun, change his ground, and put his conduct on another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." *Ohio & Mississippi Ry. Co. v. McCarthy*, 96 U.S. (6 Otto) 258, 267, 268; 24 L.Ed. 693 (1877). *See also, Rainier v. Champion Container Company*, 294 F.2d 96 (2nd Cir. 1961).

■ Further, according to Section 9–203 of the U.C.C., as adopted by Texas, it is not necessary to have a written pledge agreement in order to perfect a security interest by a pledge. *Matter of Swedenborg*, 55 B.R. 820, 824 (Bankr.N.D.Ohio 1985). Perfection of a security interest in a pledge may be perfected either by a written pledge agreement or by possession.[3] Since the requirement is in the disjunctive, it may be satisfied either by signing or by possession. The delivery of the pledged securities by the Debtor to Halliburton is further evidence of the intent of the parties to create a binding contract.

#### B. *Halliburton's Right To Relief From Stay*

Under § 362(g) of the Code, the party requesting relief from the automatic stay provision has the burden of proof of the debtor's equity in the property, and the opponent has the burden of proof on all other issues. [11 U.S.C. § 362(g)(1) and (2)]. To meet its burden Halliburton must demonstrate that the value of the collat-eral, i.e., the 5,000 shares held by Debtor, is less than the amount of the debt. The undisputed amount of the debt as of February 19, 1988 was $2,544,371.74, which included accrued interest at 18% penalty rate after acceleration on June 26, 1987. (PX 9A and 9B).

Several possible valuations of the Debtor company were offered.

1. Values listed in Debtor's Statement of Affairs filed July 23, 1987:

Book Value as of 12/31/85 ....... $2,547,672.00
" " " " 12/31/86 ....... $2,553,018.00
Fair Market Value ................. $1,376,317.83
(Machinery, etc. $842,534.00; Receivables $533,-783.83)

2. Operating report filed 2/11/88 by Trustee

Total value of Debtor's assets .. $1,514,-711.00

3. Sitton Testimony:

a) Valuation at time of buyers' offer during negotiations in April and May of 1987, based on equipment, project lists, etc. . $2,000,000.00–$2,500,000.00 No subsequent valuation was made.

b) Book value as of 1985 may have been $3,000,000.00, but book value would surely be higher for 1985 than for 1987 because assets were continuing to be used over those two years, and equipment was not being replaced.

■ This Court need not determine whether book value or market value is the appropriate measure of the value of the collateral since it is clear from the Debtor's own schedules and the Trustee's reports that the value of Debtor's assets, which includes items in which Halliburton does not have a security interest, is less than the amount of the debt. Halliburton has met its burden of proof under § 362(g) to establish that the Debtor has no equity in the property.

### III.

■ U.S. Trade and James Ray argue that Halliburton is not entitled to relief from stay because of lack of good faith and

---

**3.** (a) .... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement.... Section 9.203 of the Texas Business and Commercial Code.

undue control over Debtor. Lack of good faith is allegedly demonstrated by 1) Halliburton's rejection of Debtor's offer of a work-out plan and cash offer following Debtor's default and 2) an assertion that the condition of the company and its value could not support the obligation placed upon it by the notes. Halliburton responds that it is seeking not an equitable remedy but a determination of its legal rights.

Testimony revealed that purchasers were fully aware of Debtor's financial situation. Charles Smith testified that he first learned of Halliburton's desire to divest itself of Debtor in December, 1985 and that he subsequently assembled a group of investors. (Deposition of Charles Smith, Tr., pp. 12–15.) According to Lester L. Coleman, senior vice-president of administration and corporate development at Halliburton, once negotiations were completed, he reviewed the financial aspects of the transaction with Mr. Sitton and came to the conclusion that it was a reasonable arrangement. Halliburton was concerned that the purchasers not enter into an agreement on which they couldn't perform. (Deposition of Lester Coleman, Tr. p. 27.) He testified that, based on the business plan of the investor group and their representations to Halliburton, Halliburton concluded that "they had a reasonable opportunity to perform what they were undertaking to do." *Id.* at 69–70.

Additional unrefuted deposition testimony indicated that the sources of funding were not intended to be merely operating profits but that buyers intended to generate income through the sale of some assets and the leasing of unneeded equipment. According to Charles Smith, who was one of the new investors and president of Debtor before and after Mr. Zerr, the buyers were aware that Debtor had not been profitable for several years, but they expected to achieve new profitability through a scaling down of operations and an emphasis on the equipment leasing business. (Deposition of Charles Smith, Tr. pp. 16–18, 22.) The investors had free access to the Debtor's financial records and themselves came up with the amortization schedule for the Secured Note. (Smith Depos. Tr. pp. 19–20; PX 1.)

While in every contract "there exists an implied convenant of good faith and fair dealing," *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933), U.S. Trade's reliance on *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), to support its contention that Halliburton's failure to accept Debtor's post-default terms was proof of bad faith, is misplaced. In that case there was no default, the bank was fully secured, and the bank's refusal without notice to advance funds to K.M.C. was evidence of bad faith. *K.M.C.* at 761. Here, the Debtor was in default, notice was given of acceleration of the note, and Halliburton's refusal to accept the proposals offered by Debtor cannot be characterized as negotiating in bad faith.

■ Regarding Halliburton's control over Debtor, the agreement between the parties provided that Halliburton be given Debtor's accounting and financial statements on a regular basis and that books and records be available to Halliburton for inspection during the normal business day. (PX 1). The agreement further provided that checks were to be countersigned by a Halliburton designated representative. Those terms are customary terms in security agreements agreed to by the parties and are not indicative of undue control. No convincing evidence of undue control by Halliburton is found.

## CONCLUSION

Halliburton possesses a valid and enforceable pledge of Debtor's 5,000 shares of stock. The debt securing that pledge is in default. The amount of the debt as of February 19, 1988 was $2,544,371.74. This amount is greater than the value of the collateral which secures this debt. Thusly, Debtor has no equity in the collateral, and Halliburton is entitled to relief from stay to enforce the pledge agreement. The entire debt is secured by the pledge according to the terms of the Pledge Agreement. (*See* PX 3, ¶ 1.) Accordingly, Halliburton Company is granted relief from stay to exercise

its rights to enforce the subject Pledge Agreement.

IT IS SO ORDERED.